

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Nilda Figueroa Rivera<br><br>    Recurrida<br><br><br>                v.<br><br><br>El Telar, Inc.<br><br>      Peticionaria | Certiorari<br><br>2010 TSPR 59<br><br>178 DPR ____ |

Número del Caso: CC-2008-878


Fecha: 21 de abril de 2010


Tribunal de Apelaciones:

        Región Judicial Guayama Panel X

Juez Ponente:
        Hon. José Miranda de Hostos


Abogados de la Parte Peticionaria:

        Lcdo. Ricardo Pizarro
        Lcda. Viviana M. Mejías Díaz


Abogado de la Parte Recurrida:

        Lcdo. Diego Ledée Bazán

Materia: Despido Injustificado Ley Núm. 2


Este documento constituye un documento oficial del   Tribunal Supremo que está sujeto a los cambios y correcciones del pr   oceso de compilación y publicación oficial de las decisiones   del Tribunal. Su distribución electrónica se hace como un servici   o público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Nilda Figueroa Rivera

    Recurrida

       v.                     CC-2008-878

El Telar, Inc.

    Peticionaria

SENTENCIA

En San Juan, Puerto Rico, a 21 de abril de 2010.

El traslado de la recurrida, Nilda Figueroa Rivera, no configuró un despido constructivo que le otorgue remedio alguno al amparo de la Ley Núm. 80 de 30 de Mayo de 1976, mejor conocida como la Ley de Despido Injustificado, 29 L.P.R.A. sec. 185a y ss. Por consiguiente, se revoca la sentencia emitida por el Tribunal de Apelaciones, Región Judicial de Guayama. En su lugar, se desestima la reclamación de autos presentada por la Sra. Nilda Figueroa Rivera contra El Telar, Inc., al amparo de la Ley Núm. 80, supra.

Así lo acordó y ordena el Tribunal, y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió una Opinión de Conformidad a la que se une el Juez Asociado señor Rivera Pérez y el Juez Asociado señor Kolthoff Caraballo. La Jueza Asociada señora Fiol Matta emitió Opinión Disidente a la cual se une la Juez Asociada señora Rodríguez Rodríguez. La Jueza Asociada señora Pabón Charneco no interviene.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Nilda Figueroa Rivera

      Recurrida

        v.                       CC-2008-878

El Telar, Inc.

      Peticionaria

Opinión de conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES a la que se unen el Juez Asociado señor RIVERA PÉREZ y el Juez Asociado señor KOLTHOFF CARABALLO.

En San Juan, Puerto Rico, a 21 de abril de 2010.

En este recurso debemos resolver si la implantación del estudio de antigüedad realizado por El Telar, Inc., constituyó el despido constructivo de la Sra. Nilda Figueroa Rivera, compensable al amparo de la Ley Núm. 80 de 30 de Mayo de 1976, mejor conocida como la Ley de Despido Injustificado, 29 L.P.R.A. sec. 185a y ss. Este Tribunal resuelve la interrogante en la negativa, por lo que estoy conforme con que se revoque la sentencia emitida por el Tribunal de Apelaciones, Región de Guayama. Al así proceder, es importante

tomar en cuenta los factores que configuran un despido injustificado y los criterios que establece la Ley Núm. 80, id., como justa causa para despedir empleados por razón de un cierre parcial de operaciones.

I

Los hechos de este caso no están en controversia. El Telar, Inc. es una corporación que opera diversas tiendas en Puerto Rico. En aspectos de personal esta empresa opera sus tiendas de forma sustancialmente integradas conforme al Art. 3 de la Ley Núm. 80, id., sec. 185c(b).

La señora Figueroa Rivera comenzó a trabajar para El Telar el 19 de mayo de 1988. En 1997 fue ascendida a gerente de la tienda de *Guayama Mall*. Debido a razones económicas, El Telar comenzó a cerrar varias tiendas, una de las cuales fue la de *Guayama Mall*. El Telar le notificó a la señora Figueroa Rivera el cierre de la tienda que hasta entonces dirigía y su traslado a la tienda de Mayagüez. Debido a su traslado, la señora Figueroa Rivera renunció a su trabajo.

El Telar realizó un estudio de antigüedad entre sus empleados e identificó que la gerente de la tienda de Mayagüez era la empleada con menos antigüedad en la clasificación de Gerente de Tienda. Debido a esto, El Telar despidió a la gerente de la tienda de Mayagüez y le asignó esta tienda a la señora Figueroa Rivera. Con este proceder, El Telar entendió que cumplía con los parámetros establecidos en la Ley Núm. 80, id., al retener a la

gerente de la tienda cerrada (señora Figueroa Rivera) sobre la gerente de menos antigüedad en la empresa.

Por estos hechos, el 20 de octubre de 2006, la señora Figueroa Rivera presentó ante el Tribunal de Primera Instancia una acción por despido injustificado contra El Telar. En su reclamación la señora Figueroa Rivera alegó que tiene derecho a la compensación provista por la Ley Núm. 80, ibíd. La señora Figueroa Rivera sostiene que la actuación de El Telar constituyó un despido constructivo debido a la distancia entre su residencia y la sucursal a la cual fue asignada en Mayagüez. La recurrida, Figueroa Rivera, arguyó que ante el cierre de la tienda de *Guayama Mall* procedía ubicarla en la tienda de Guayama Pueblo, a base del principio de antigüedad, pues la gerente de esta tienda tenía menos años trabajando para El Telar.

Luego de celebrar la conferencia con antelación a juicio y con anuencia de las partes, el Tribunal de Primera Instancia concluyó que la controversia se reducía a una interpretación de derecho. El foro primario determinó los siguientes hechos: (1) El Telar cerró varias tiendas por factores económicos, entre las cuales se encontraba la que ubica en *Guayama Mall*, mientras se mantenían abiertas las tiendas de Guayama Pueblo, Juana Díaz "y otras más cerca [en relación a la tienda de Mayagüez y la residencia de la señora Figueroa Rivera]..., aunque estaba proyectado el cierre de más tiendas". Sentencia del Tribunal de Primera Instancia, pág. 2. (2)

El procedimiento de antigüedad implantado por El Telar identificó a la gerente de la tienda de Mayagüez como la de menor antigüedad en su clasificación y le asignó esta plaza a la gerente de la tienda cerrada (la señora Figueroa Rivera); igual se hizo con las demás posiciones de la empresa. (3) La gerente de la tienda en Mayagüez era la empleada en esta clasificación con menos antigüedad en la empresa; y (4) la gerente de la tienda de Guayama Pueblo (que se mantenía abierta) tenía menos años en la empresa que la señora Figueroa Rivera.

El Tribunal de Primera Instancia estimó que "en el caso de autos no estamos ante una actuación ejercida por mero capricho o sin razón relacionada con el buen y normal funcionamiento del establecimiento". Sentencia del Tribunal de Primera Instancia, pág. 4. No obstante, el foro primario concluyó que la implementación del estudio de antigüedad establecido por El Telar tuvo el efecto de que "empleados en la misma categoría con mucho menos tiempo en la empresa queden ubicados en una mejor plaza que los de mayor antigüedad". Id., pág. 5. Con este razonamiento, el tribunal coligió que la actuación del patrono tornó oneroso el ambiente de trabajo de la señora Figueroa Rivera y declaró con lugar la reclamación al amparo de la Ley Núm. 80, supra.

Ante este dictamen, El Telar acudió al Tribunal de Apelaciones. Este último confirmó la sentencia recurrida ya que El Telar "no permitió que la [señora Figueroa

Rivera] ocupara la posición de gerente en la tienda de Guayama Pueblo, cuando la gerente en dicha tienda tiene menor antigüedad que ella...". Sentencia del Tribunal de Apelaciones, pág. 7. El tribunal entendió que el traslado ordenado era una condición onerosa de trabajo para la señora Figueroa Rivera lo que constituyó un despido constructivo. Al igual que el Tribunal de Primera Instancia, el Tribunal de Apelaciones razonó que "el despido constructivo... fue provocado por el plan de antigüedad de El Telar, por lo cual procede la demanda instada por despido injustificado". Ibíd.

Inconforme que esta determinación, El Telar acude a este foro y alega que los tribunales inferiores erraron en su proceder. En síntesis, El Telar sostiene que su actuación no constituyó un despido injustificado según la Ley Núm. 80, supra. El 20 de marzo de 2009, expedimos el auto de certiorari y el recurso quedo sometido en sus méritos el 2 de septiembre de 2009.

II

Para disponer de este recurso es preciso determinar si el proceso seguido por El Telar para delimitar los derechos de sus empleados a base de su antigüedad, que concluyó con el traslado de la señora Figueroa Rivera, configuró un despido injustificado al amparo de la Ley Núm. 80, ibíd.

La Ley Núm. 80, id., concede a los empleados el derecho a recibir una indemnización en casos en que sean

despedidos de su cargo sin justa causa. Véanse, Jusino *et als*. v. Walgreens, 155 D.P.R. 560 (2001); Díaz v. Wyndham Hotel Corp., 155 D.P.R. 364 (2001); Soc. De Gananciales v. Royal Bank de P.R., 145 D.P.R. 178 (1998); Piñeiro v. Int´l Air Serv. of P.R., 140 D.P.R. 343 (1996).

El propósito de esta medida es otorgarle un derecho más efectivo y justiciero a los obreros que sufren los daños de un despido injustificado. Exposición de Motivos de la Ley Núm. 80, supra. De una lectura de la Ley Núm. 80, supra, y de su Exposición de Motivos se puede apreciar que la intención de la Asamblea Legislativa fue sancionar y disuadir el despido de un empleado sin justa causa. Ahora bien, no se entenderá como una causa injustificada las movidas de personal "para poder mantener operando el establecimiento; o con motivo de cualquier otra actuación del patrono conducente exclusivamente a la administración más eficiente del establecimiento". Exposición de Motivos, ibíd. Lo que la reglamentación contra el despido injustificado pretende es desalentar y penalizar "la práctica de cesantear a empleados por razones que no tienen que ver con su desempeño en las labores o las necesidades del negocio". C.R. Carrión Crespo, Los remedios exclusivos en el despido injustificado y el accidente del trabajo: Legislación protectora del patrono, 32 Rev. Jur. U.I.P.R. 89, 106 (1997).

En Srio. Del Trabajo v. G.P. Inds., 153 D.P.R. 223, 244 (2001), expresamos que el despido por justa causa de

la Ley Núm. 80, supra, "es aquel que delimita las circunstancias en que éste se produce; es decir, cuando tiene su origen en alguna razón o motivo vinculado a la ordenada marcha y normal funcionamiento de una empresa y no en el libre arbitrio o capricho del patrono". El desglose de circunstancias que justifican un despido, según la Ley Núm. 80, supra, no excluye aquélla "que, por estar vinculada al buen funcionamiento de la empresa, podría constituir justa causa para el despido". Ibíd. Se entiende por "justa causa" para el despido la razón que tiene su origen en una "razón vinculada a la ordenada marcha y normal funcionamiento de la empresa". Secretario del Trabajo v. I.T.T., 108 D.P.R. 536, 543 (1979).

Esta ley "incorporó, a manera ilustrativa, una serie de causales o situaciones, en las que el despido se considera justificado". Exposición de Motivos de la Ley Núm. 95 de 30 de junio de 2007. La Ley Núm. 80, supra, no define el término de "despido sin justa causa", aunque enumera, "a modo general una serie de circunstancias que justifican el despido de un empleado u empleada". Jusino et als. v. Walgreens, supra, pág. 572. El estatuto contempla dos tipos de causales para que el despido de un empleado se considere hecho con justa causa: (1) actuaciones imputables al obrero y de las cuales se entiende que ha provocado su despido; y (2) situaciones no imputables al obrero pero que son de tal naturaleza que su despido resulta prácticamente inevitable. En las

situaciones incluidas en el segundo tipo se encuentran el cierre de operaciones, reorganizaciones y reducciones de personal.

> El obrero, en relación con este último tipo de causa de despido, no motivada por él, tiene el derecho, primero a que al determinar los obreros que han de ser despedidos por las antedichas causas se le dé preferencia para permanecer en el empleo a los obreros de más antigüedad, siempre que subsistan puestos vacantes ocupados por empleados de menos antigüedad en el empleo que puedan ser despeñados por ellos.

Informe de la Comisión de Trabajo y Asuntos del Veterano en la Cámara de Representantes sobre el P. del S. 1112, pág. 3. Véase además, Informe Conjunto de las Comisiones de Trabajo y Derechos Civiles y Servicio Público del Senado de Puerto Rico sobre el P. del S. 1112, pág. 4.

Surge del Diario de Sesiones que la Asamblea Legislativa quiso hacer un balance de los intereses involucrados. Sobre el particular, el senador Hon. Jesús Hernández Sánchez señaló:

> [E]n la medida en que una sociedad donde la legislatura tiene que balancear ambos intereses, el interés del sector industrial y el de los intereses de la fuerza trabajadora cuando la legislatura carga mucho a favor de la fuerza laborar [sic] los patronos son renuentes a acudir a esa sociedad a invertir... tenemos que atemperar esos intereses que chocan entre sí y tenemos que medir también [la] tasa de desempleo... la legislatura tiene que ser comedida en ese equilibrio que tiene que mantener.

Diario de Sesiones del Senado, séptima Asamblea Legislativa, tercera Sesión Ordinaria, P. del S. 1112, 24 de mayo de 1975, págs. 106-107.

Por su parte, el senador Hon. Neftalí Hernández González manifestó que esta medida "es un esfuerzo genuino de tratar de conseguir una posición ecléctica, que nos permita por un lado garantizarle a un obrero que estará protegido [contra un] despido injustificado y por el otro lado, el garantizar la estabilidad de las industrias que actualmente estamos estableciendo y que actualmente están establecidas". Diario de Sesiones del Senado, id., pág. 109.

La Ley Núm. 80, supra, provee una protección "tanto para el patrono como para el obrero.... Siendo de gran interés para el gobierno mantener un clima laboral saludable en las empresas privadas, se ha establecido un balance de interés [sic] razonable entre los derechos del patrono y del trabajador". Exposición de Motivos de la Ley Núm. 128 de 7 de octubre de 2005. Para que el despido de un empleado se considere justificado debe: (1) no ser por capricho y (2) tiene que estar vinculado al buen y normal funcionamiento de la empresa. C. Zeno Santiago, El despido y la política social en nuestro estado de Derecho, 34 Rev. Jur. U.I.P.R. 213, 225 (2000).

El Prof. Luis H. Sánchez Caso explica que el "legislador ha adoptado el enfoque de una garantía de carácter relativo, pues sólo pretende disuadir al patrono para que ejerza su derecho a despedir en los casos de causa justificada". L.H. Sánchez Caso, Reflexiones sobre la responsabilidad civil de los oficiales y gerenciales en

reclamaciones de despido o discrimen, 39 Rev. Jur. U.I.P.R. 239, 244 (2004). "Del desarrollo histórico de nuestra legislación sobre el despido, podemos ver los perfiles que ha mantenido nuestra legislación. Todas las leyes han garantizado y protegido el derecho de dirección empresarial...". Ibíd.

El Art. 2 de la Ley Núm. 80, supra, sec. 185b(d), (e) y (f), considera como justa causa, entre otras, que el despido surja como consecuencia de (1) cierre total, temporero o parcial de las operaciones del establecimiento; (2) cambios tecnológicos o de reorganización; y (3) reducciones en empleo que se hacen necesarias debido a una disminución en el volumen de producción, ventas o ganancias. Esta disposición provee expresamente que "no se considerará despido por justa causa aquel que se hace por el mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento". Id., sec. 185b. Las leyes Núm. 65 de 3 de julio de 1986 y Núm. 9 de 3 de octubre de 1986, añadieron como injustificado el despido que se hace como consecuencia de las expresiones de un empleado y relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando estas expresiones no constituyan divulgación de información privilegiada ni sean de carácter difamatorio. Art. 2 de la Ley Núm. 80, ibíd.

Por su parte, el Art. 3 de la Ley Núm. 80, supra, sec. 185c, dispone que en los casos de despidos por las razones antes descritas, el patrono está "obligado a retener con preferencia en el empleo a los empleados de más antigüedad siempre que subsistan puestos vacantes u ocupados por empleados de menos antigüedad en el empleo dentro de su clasificación ocupacional que puedan ser desempeñados por ellos"..., salvo que haya una "diferencia clara o inconcursa [sic] a favor de la eficiencia o capacidad de trabajadores comparados en cuyo caso prevalecerá la capacidad". Ibíd. Véase, en general, A. Acevedo Colom, Legislación Protectora del Trabajo Comentada, 6t ed., San Juan, P.R., Ramallo Printing Bros., 1999, págs. 190.

> Se trata de causales relacionadas con el funcionamiento de la empresa y con decisiones que comúnmente se adoptan en el curso ordinario de su administración. El propósito de establecer y condicionar estas causales en la Ley es proteger al empleado de despidos arbitrarios y caprichosos, y dejar establecido que los mismos tienen que estar relacionados con el normal y buen funcionamiento de la empresa.

Exposición de Motivos de la Ley Núm. 95 de 30 de julio de 2007.

Por otro lado,

> [d]el alcance de la citada Ley, se excluyó los casos de despidos por cambios tecnológicos o de reorganización, o del cese total o parcial de las operaciones de una empresa. Es decir, cuando ocurre un despido por las razones antes expuestas, los obreros no tienen derecho a otra compensación que no sea aquella correspondiente al trabajo llevado a cabo y no pagado.

Exposición de Motivos de la Ley Núm. 278 de 15 de agosto de 2008.

La Ley Núm. 80, supra, establece dos factores que rigen la forma en que se realizará el despido de empleados ante un cierre parcial de operaciones o una reducción parcial en el empleo. Éstas son la antigüedad y la eficiencia. Zeno Santiago, supra, pág. 223. Cuando se trata de empresas que tienen varias "oficinas, fábricas, sucursales o plantas en las cuales existe la práctica usual y regular de que sus empleados se trasladan de una unidad a otra y que las distintas unidades operan de forma sustancialmente integradas en cuanto a los aspectos de personal, la antigüedad se computará a base de todos los empleados de la empresa... que están en la clasificación ocupacional objeto de la reducción de personal". Sec. 185c(b), supra.

El Profesor Zeno Santiago expresa que para prosperar en una acción de despido injustificado bajo la Ley Núm. 80, supra, hay que demostrar que la parte demandante: (1) es un empleado; (2) que trabajaba mediante remuneración de clase alguna; (3) laboraba a tiempo indeterminado; y (4) fue despedido sin que medie justa causa. Zeno Santiago, supra, págs. 215-216. Es "importante destacar que el estándar de justa causa es el requisito requerido en la mayoría de los países del mundo para convalidar las actuaciones de los empleadores conforme [con] sus prerrogativas gerenciales. Si el patrono despide

injustificadamente a un trabajador estaría entonces sujeto a la sanción económica que impone el estatuto protector". Id., pág. 217. Véase, además, Carrión Crespo, supra. "En nuestra jurisdicción el despido de un empleado siempre será válido si es por justa causa". Zeno Santiago, supra, pág. 220.

Para la aplicación de la Ley Núm. 80, supra, se considera que hubo un despido cuando un empleado renuncia a su empleo motivado "por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra". Art. 5, id., sec. 185e. Véanse, además, Informe Conjunto del Senado, supra, pág. 4; Informe de la Cámara, supra, pág. 4.

De esta forma se integró a nuestro ordenamiento lo que en el *common law* se conoce como despido constructivo (*constructive discharge*) que es "la renuncia involuntaria de un empleado, producto de las condiciones a las que le somete el patrono deliberadamente, creando un ambiente tan intolerable, que un empleado se siente forzado a renunciar". Zeno Santiago, supra, pág. 217.

Mediante la Ley Núm. 67 de 3 de julio de 1986, se autorizó al Secretario del Trabajo y Recursos Humanos a adoptar y promulgar toda reglamentación necesaria para administrar la Ley Núm. 80, supra. Art. 13 de la Ley Núm.

80, supra, sec. 185m. Según la Guía Revisada para la Aplicación de la Ley Núm. 80 de 30 de mayo de 1976, de 2000, promulgada por el Departamento del Trabajo y Recursos Humanos, un despido constructivo se da por

> [l]os actos voluntarios, onerosos e injustificados dirigidos a obligar al empleado a dejar su cargo cuando la única alternativa razonable que le queda al empleado para corregir la situación adversa que enfrenta en el trabajo es la renuncia.... [L]a definición que ofrece la ley debe interpretarse conjuntamente con la que brinda el Tribunal Supremo bajo la derogada Ley Núm. 50....

Id., pág. 24.

Estas acciones configuran lo que se conoce como despido constructivo o tácito. La causa de acción "tiene dos elementos básicos que tienen que estar presentes para que esa forma de despido ocurra...". Éstas son: (1) acciones de seriedad considerable por parte del patrono; y (2) el empleado no debe tener otra alternativa que no sea la renuncia para resolver la situación adversa que enfrenta en el trabajo, o que aunque el empleado tenga otra alternativa que no sea la renuncia, el patrono propició una condición de riesgo inminente para la vida o para la salud del empleado. Ibíd. Estas actuaciones deben ser "originadas por un motivo ajeno al legítimo interés de salvaguardar el efectivo desempeño en el empleo...". Id., pág. 25.

Para determinar si la actuación del patrono fue ilegal, deben tomarse en consideración, entre otros, los siguientes factores: (1) la condición económica de la

empresa; (2) los cambios tecnológicos o de cualquier otra forma que se han realizado en la empresa; (3) el desempeño y eficiencia del empleado; (4) el nivel de compensación del empleado; (5) las condiciones de trabajo de los demás empleados de la empresa; (6) la antigüedad del empleado y (7) las razones esbozadas por el patrono para justificar su actuación. Ibíd.

En Vélez De Reilova v. R. Palmer Bros., Inc., 94 D.P.R. 175 (1967), reconocimos que los actos voluntarios e injustificados de un patrono dirigidos a obligar al empleado a renunciar, constituyen un despido cuando la única alternativa razonable para ese empleado es la renuncia. Véase, Arthur Young & Co. v. Vega III, 136 D.P.R. 157 (1994). Además, en Soc. De Gananciales v. Royal Bank de P.R., supra, expresamos que el despido constructivo surge cuando el empleado renuncia motivado por "actuaciones del patrono, tales como: la imposición de condiciones onerosas de trabajo, la reducción de salario, el descenso en el puesto, entre otras". Id., pág. 199.

III

En este recurso, como cuestión de umbral, debemos determinar si la señora Figueroa Rivera fue sometida a un despido constructivo o tácito. Esto es, debemos determinar si su traslado violó las disposiciones de la Ley Núm. 80, supra. Una reclamación al amparo de esta ley requiere que se establezca que al empleado se le despidió de su cargo o

puesto, pues la indemnización provista procede únicamente cuando ocurre un despido que resulta injustificado.

Para que se configure esta modalidad de despido tienen que existir unas actuaciones del patrono dirigidas a forzar al empleado a renunciar. Debido a que esta doctrina describe un despido funcional, que no es otra cosa que un despido disfrazado de renuncia, se requiere una actuación injustificada y deliberada por parte del patrono. Al examinar conjuntamente toda la discusión de esta doctrina, se puede colegir que para su aplicación se requieren: (1) uno o más actos voluntarios por parte del patrono; (2) motivados por una razón ajena al legítimo interés de salvaguardar el efectivo desempeño de la empresa, o por una motivación que pueda calificarse como caprichosa, arbitraria e irrazonable; y (3) que se cree una condición onerosa para el empleado que fuerce inevitablemente la renuncia a su puesto.

Para revisar la actuación del patrono que provocó la renuncia debemos tomar en consideración, entre otros factores: (1) la condición económica de la empresa; (2) los cambios realizados en ella; (3) el desempeño y eficiencia del empleado; (4) el nivel de compensación del empleado; (5) las condiciones de trabajo de los demás empleados; (6) su antigüedad en el empleo; y (7) las razones esbozadas por el patrono para justificar su actuación.

En este caso, El Telar se vio en la necesidad de cerrar la tienda de *Guayama Mall*, en la cual trabajaba la recurrida Figueroa Rivera. Este cierre fue parte de un proceso de reorganización producto de la situación económica por la que atravesaba la empresa. Debido a la necesidad de reducción de personal y de tiendas, El Telar realizó un estudio de antigüedad conforme a la Ley Núm. 80, id., para identificar los gerentes con menos años en la empresa. De este estudio resultó que la gerente de la tienda de Mayagüez era la de menos antigüedad, por lo que El Telar procedió a prescindir de sus servicios y trasladó a la gerente de la tienda cerrada a este puesto.

La señora Figueroa Rivera sostiene que procedía asignarle la tienda de Guayama Pueblo pues la gerente de dicha tienda llevaba menos años en la empresa. No podemos refrendar tal contención sin intervenir impermisiblemente con una prerrogativa empresarial válida. Para los casos de reducción de personal, el Artículo 3 de la Ley Núm. 80, id., ordena tomar en consideración la antigüedad de un empleado para su retención preferencial sobre los de menos antigüedad. Precisamente esto fue lo que hizo El Telar, al proteger a la señora Figueroa Rivera por encima de la gerente de la tienda de Mayagüez. Sería un contrasentido penalizar a la empresa por cumplir con el mandato de la ley. Ahora bien, la Ley Núm. 80, *id.*, no le concede a la peticionaria el derecho de escoger en qué sucursal prefiere trabajar.

La Opinión Disidente de la Jueza Asociada señora Fiol Matta aplica un escrutinio contrario al que establece la Ley Núm. 80, supra. Según la Opinión Disidente,

> se necesita determinar si la actuación de El Telar de trasladarla de Guayama a Mayagüez para realizar su trabajo resultó onerosa, si su única opción razonable era renunciar y si el patrono tenía otras alternativas menos onerosas que evitaran su determinación. Si el patrono no tenía otras alternativas estamos en la obligación de considerar que se trató de una medida legítima y justificada. Por el contrario, si tenía otras alternativas entonces su determinación fue caprichosa e injustificada.

Opinión disidente, pág. 31.

Debe quedar claro que el hecho de que un empleado renuncie porque el patrono le impuso condiciones de trabajo más onerosas puede considerarse como un despido, según el Artículo 5 de la Ley Núm. 80, supra, sec. 185c. Ese despido, sin embargo, puede estar justificado. Por ejemplo, puede que la alternativa menos onerosa para el empleado sea la más onerosa para el patrono. Lo que requiere la Ley Núm. 80, supra, y la jurisprudencia antes discutida, es que la actuación del patrono sea razonable y que esté relacionada con el buen y normal funcionamiento del establecimiento. Art. 2, supra, sec. 185(b). La regla que propone la Opinión Disidente constituye una camisa de fuerza para el patrono que es contraria al texto y espíritu de la Ley Núm. 80, supra. Acoger dicho criterio sería establecer un escrutinio más estricto que el que contempló el legislador, con el efecto de limitar las

facultades gerenciales legítimas del patrono. La Ley Núm. 80, id., no contempla tal cosa.

El Telar es una empresa que cuenta con una serie de tiendas distribuidas en toda la isla. Enviar a la señora Figueroa Rivera a la tienda de Guayama Pueblo bajo el alegado mandato de la Ley Núm. 80, supra, interferiría sustancialmente con la administración eficiente de la empresa. Ese resultado fue vislumbrado y rechazado por el legislador. De tener la obligación de trasladar a los gerentes de cada tienda según sus preferencias y en atención al orden de antigüedad, se provocaría una cadena de traslados que atentaría contra el normal y buen funcionamiento de la empresa. Por ejemplo, la señora Rivera Figueroa solicita ser trasladada a la tienda de Guayama Pueblo, lo que a su vez requeriría que la gerente de esta tienda fuera trasladada a otra tienda, y así sucesivamente. Esto provocaría un desplazamiento en cadena de gerentes a través de toda la isla. Sentencia del Tribunal de Primera Instancia, págs. 2-3.

Al examinar los hechos de este caso, es forzoso concluir que no se configuró un despido constructivo, cuestión indispensable para una reclamación al amparo de la Ley Núm. 80, supra. La razón para la actuación del patrono fue su legítimo interés de salvaguardar el efectivo desempeño de su empresa. El error de los tribunales inferiores estriba en concluir que para configurar un despido constructivo solamente se requiere

establecer una condición onerosa que obligue al empleado a renunciar, sin la debida consideración de los factores antes discutidos. En cada caso particular pueden concurrir un sinnúmero de condiciones onerosas que pueden llevar a un empleado a renunciar a su puesto pero ello no necesariamente constituye un despido constructivo indemnizable bajo la Ley Núm. 80, supra.

Aunque la acción de El Telar provocó una condición onerosa para la señora Figueroa Rivera, tuvo un motivo legítimo y justificado. Como bien señaló el foro primario, no estamos ante una actuación ejercitada por el mero capricho, sino ante un traslado producto de razones directamente relacionadas con el buen y normal funcionamiento de la empresa, y diseñado para cumplir con el texto de la Ley Núm. 80, ibíd. Por esa razón, estoy conforme con la Sentencia que hoy emitimos.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


NILDA FIGUEROA RIVERA
        Recurrida


        v.


                              CC-2008-878
    EL TELAR, INC.
      Peticionaria




Opinión Disidente emitida por la Jueza Asociada señora Fiol Matta a la cual se une la Juez Asociada señora Rodríguez Rodríguez


En San Juan, Puerto Rico, a 21 de abril de 2010.

> Cuando el desempleo condena a un ser humano y a su familia al hambre o a la indignidad, hay que llegar a límites de exigencia para privarle de la protección que ha ganado acceso a nuestra legislación social. …**Cristalina debe ser la justificación que se ofrezca para despedirlo sin este mínimo abono a los años de servicio que representan la inversión de su único haber en la estructura de producción: sus energías, su capacidad física e intelectual durante los años más fecundos, en fin, su salud que declina con el tiempo.**[1]

No puedo dar mi aval a la decisión que hoy anuncia la mayoría de este Tribunal. Esta decisión no sólo deja desamparada a una empleada que dedicó prácticamente toda su vida a la compañía El Telar, Inc., sino que, con toda probabilidad, la convierte

---

[1] Énfasis nuestro. Secretario del Trabajo v. I.T.T., 108 D.P.R. 536, 547 (1979).

en otra de las estadísticas del desempleo, pues, desafortunadamente, cuando un trabajador maduro es despedido, es poco probable que obtenga un nuevo empleo. En esas circunstancias es particularmente importante reconocer que el remedio exclusivo de la Ley Núm. 80 de 1976, según enmendada (Ley 80) que incluye la mesada y la indemnización progresiva, es un alivio a las serias y detrimentales consecuencias que la pérdida de un empleo provoca principalmente en el empleado, pero también, y por lógica repercusión, en su familia y la sociedad en general. Antes de negarle esta exigua compensación a un trabajador que es despedido sin justa causa, el Tribunal debe hacer un análisis ponderado y sosegado en el que considere los propósitos de la Ley 80. Con respeto, no encuentro este análisis en la opinión de conformidad emitida en este caso.

Quizás más preocupante aún, es que **la controversia que está ante nosotros nada tiene que ver con el derecho del patrono a dirigir su establecimiento de la manera más adecuada y fructífera a sus intereses económicos, como equivocadamente afirma la mayoría.** No se cuestiona en este caso la facultad del patrono de tomar decisiones legítimas, incluso el cierre por motivos económicos. **En vez, este caso está relacionado con el procedimiento adoptado por un patrono para discernir qué empleados gerenciales serán mantenidos en sus puestos, ante un cierre parcial o reducción en empleo. El procedimiento utilizado en este caso y sustentado por este Tribunal resulta oneroso e irrazonable**

**en su aplicación al interés de la Sra. Nilda Figueroa Rivera y, peor aún, resulta contrario al espíritu y finalidad de la Ley 80, que es proteger la tenencia del empleo, a la luz del criterio de antigüedad.**

Distinto a la mayoría, entiendo que la renuncia de la señora Figueroa Rivera obedeció a un despido tácito, como consecuencia de la arbitrariedad, el capricho y la unilateralidad del patrono al implantar su plan de antigüedad. **Ese plan posibilitó que una empleada de apenas 6 meses en el empleo resultara más afortunada que la señora Figueroa Rivera, quien laboró gran parte de su vida para El Telar.** Tal realidad es fácilmente constatable con sólo examinar el escueto estudio de antigüedad sometido por el Telar. Los hechos pertinentes de este caso validan esta conclusión.

## I

La señora Figueroa Rivera es residente del pueblo de Guayama. El 19 de mayo de 1988, comenzó a trabajar como cajera en la sucursal "Guayama Pueblo" de El Telar ubicada en la calle Calimano de su pueblo de residencia. Nueve años después, específicamente en 1997, la señora Figueroa Rivera fue ascendida al puesto de gerente y asignada a la tienda El Telar que se encontraba en el centro comercial Plaza Guayama del mismo pueblo. En este puesto permaneció hasta el 24 de agosto de 2006, fecha en que renunció. Concretamente, la señora Figueroa Rivera laboró en la corporación el Telar durante 18 años.

Durante el 2006, El Telar confrontó problemas económicos que le llevaron a cerrar varias de las sucursales de su tienda en distintos pueblos del país. Como resultado de esto, la compañía procedió a despedir personal gerencial de acuerdo a un plan de antigüedad diseñado exclusivamente para esta clasificación de puesto. Éste se estructuró tomando en consideración los años de servicio del personal gerencial ubicado en todos los establecimientos.

Una de las tiendas cerradas fue la de Plaza Guayama, donde la señora Figueroa Rivera laboraba como gerente.[2] A ella no se le despidió explícitamente, sino que se le trasladó como gerente a una tienda ubicada en el pueblo de Mayagüez. Específicamente, El Telar le entregó un documento a la señora Figueroa Rivera donde le informaba su reubicación y le solicitaba que manifestara si iba aceptar el traslado porque de no hacerlo tenía que someter una carta de renuncia.[3] **A la señora Figueroa Rivera no se le dio otra opción, o aceptaba el traslado o renunciaba.** En este contexto oneroso y hostil, la señora Figueroa Rivera tuvo que renunciar a su plaza. **Sin embargo, a la Sra. Carmen Lugo, gerente de la tienda del Pueblo de Patillas, que también fue cerrada, se le trasladó a la tienda ubicada en**

---

[2] Según el "Estudio de Antigüedad" la sucursal del Telar en Plaza Guayama fue cerrada el 23 de agosto de 2006. Apéndice del recurso de apelación ante el Tribunal de Apelaciones, Estudio de Antigüedad de Gerentes, pág. 42.

[3] Apéndice del recurso de *certiorari*, "Decisión referente al Traslado de Tienda por Motivo de Cierre de Tienda Plaza Guayama", 24 de agosto de 2006, pág. 99.

**el Pueblo de Juana Díaz.  Esto a pesar de que la señora Lugo sólo llevaba 6 meses con la compañía.**[4]

El 20 de octubre de 2006, la señora Figueroa Rivera presentó una querella por despido injustificado contra El Telar.  Al contestar la querella, la compañía alegó, entre otras cosas, que: (1) la señora Figueroa Rivera no había sido despedida; (2) el acto que realizó no constituía un despido constructivo; (3) el cierre de la tienda Plaza Guayama se debió a la situación financiera y el buen y normal funcionamiento de la empresa; (4) la señora Figueroa Rivera rechazó el traslado; (5) la señora Figueroa Rivera tenía disponible otras alternativas razonables; (6) no le impusieron condiciones de trabajo onerosas a la señora Figueroa Rivera.[5]

La Conferencia con Antelación al Juicio se celebró el 20 de marzo de 2007. Durante la misma, se determinó que la controversia planteada era exclusivamente de derecho. El caso quedó sometido con el Informe de Conferencia con Antelación al Juicio, el "Alegato Entorno al Procedimiento (Incorrecto) de Despido utilizado por el Querellado"[6],

---

[4] Apéndice del recurso de apelación ante el Tribunal de Apelaciones, Estudio de Antigüedad, *op.cit.*.

[5] Apéndice del recurso de *certiorari*, "Decisión referente al Traslado de Tienda por Motivo de Cierre de Tienda Plaza Guayama", 24 de agosto de 2006, págs. 20-22.

[6] En este escrito, la señora Figueroa Rivera argumentó que el acto de trasladarla a la tienda El Telar en Mayagüez, al ser oneroso, fue la causa que la obligó a renunciar.  Ante esta realidad y la negativa del patrono de reubicarla en la plaza de gerente de la tienda Guayama Pueblo, a pesar de que la

(continúa...)

presentado por la señora Figueroa Rivera, y la "Moción Solicitando se Dicte Sentencia Sumaria", presentada por El Telar.

El 17 de junio de 2008, el Tribunal de Primera Instancia declaró con lugar la querella al concluir que el despido había sido injustificado. El Tribunal le ordenó a El Telar que indemnizara a la señora Figueroa Rivera con $24,000, computados desde el 19 de mayo de 1988 hasta el 24 de agosto de 2006, más el 25% de esta cantidad, por concepto de honorarios de abogado.  Entre otras consideraciones, el foro de instancia explicó lo siguiente:

> **La implementación del estudio de antigüedad del patrono en su aplicación tiene el efecto que empleados en la misma categoría con mucho menos tiempo en la empresa quedan ubicados en una mejor plaza que los de mayor antigüedad**…Nos preguntamos, es o no oneroso para la querellante la alternativa ofrecida por la decisión del patrono. **Coincidimos que la actuación del patrono al aplicar su estudio de antigüedad tornó el ambiente de trabajo para la querellante oneroso** [sic].  Por lo tanto, la renuncia de la querellante es un despido constructivo.[7]

De este dictamen, El Telar recurrió con un recurso de apelación ante el Tribunal de Apelaciones. Este foro apelativo confirmó, el 29 de agosto de 2009, la sentencia emitida por el tribunal de instancia porque entendió que el

gerente de esa tienda tenía menor antigüedad en la empresa, la señora Figueroa Rivera alega que se configuró un despido constructivo. Apéndice del recurso de *certiorari*, Alegato entorno al Procedimiento (Incorrecto) de Despido Utilizado por el Querellado, págs. 38-41.

[7] Énfasis nuestro.  Apéndice del recurso de *certiorari*, Sentencia del Tribunal de Primera Instancia, pág. 16.

despido constructivo de la señora Figueroa Rivera había sido provocado por el plan de antigüedad de El Telar. Específicamente, el tribunal apelativo concluyó que la aplicación a la señora Figueroa Rivera del estudio de antigüedad ocasionó que ésta renunciara a su puesto "al ser ubicada en una tienda en área geográfica distante a su residencia."[8]

Inconforme, la compañía acudió ante este Tribunal alegando que la renuncia de la señora Figueroa Rivera no configuraba un despido constructivo. Pasemos, entonces, a examinar el derecho aplicable a esta controversia.

## II

### A. La Política Pública sobre Despido en el Ámbito del Empleo Privado

En nuestro país existe una clara política pública laboral dirigida a proteger la tenencia de un empleo. Ésta ha sido el resultado de una diversidad de estatutos laborales aprobados por la Asamblea Legislativa, los cuales pueden agruparse en dos grandes grupos: aquellos que tienen la finalidad específica de prohibir el despido y permitir que el trabajador sea reinstalado en su puesto y los que, aunque no prohíben el despido, reglamentan el despido injustificado y conceden como remedio único una indemnización económica. Bajo este último renglón se incluye la Ley 80, conocida como Ley de Indemnización por Despido

---

[8] Apéndice del recurso de *certiorari*, *Íd.*, pág. 9.

Injustificado, que sólo le es aplicable a los empleados del sector privado.

La clara intención de esta legislación, de reglamentar las relaciones obrero-patronales, proteger el derecho del trabajador a la tenencia de su empleo y evitar o desalentar las prácticas de despido injustificado[9], se revela en su exposición de motivos. Sobre este particular, el precepto manifiesta lo siguiente:

> **Ya es tiempo que se proteja de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de su empleo** mediante la aprobación de una ley que a la vez que otorgue unos remedios más justicieros y consubstanciales con los daños causados por un despido injustificado desaliente la incidencia de este tipo de despido.[10]

Tan profunda era la preocupación de la Legislatura de proveer estabilidad laboral en sus empleos a los trabajadores, brindarles mayor seguridad en el empleo y disuadir a los patronos de los despidos arbitrarios y caprichosos, que durante el 2005 enmendó la Ley 80 para aumentar la indemnización económica a los obreros que eran despedidos en contra de las disposiciones del estatuto. El propósito de los legisladores para tomar esta acción se hace evidente en el siguiente texto:

---

[9] Díaz v. Wyndham Hotel Corp., 155 D.P.R. 364, 374 (2001); Véase: R. Delgado Zayas, Apunte para el Estudio de la Legislación Protectora del Trabajo en el Derecho Laboral Puertorriqueño, San Juan, Puerto Rico, Ramallo Bros. Printing, Inc., 2005, págs. 127-128 y C. Zeno Santiago y V. M. Bermúdez Pérez, Tratado de Derecho del Trabajo, Tomo I, Puerto Rico, Publicaciones J.T.S., 2003, pág. 35.

[10] Énfasis nuestro. Exposición de Motivos de la Ley Núm. 80 de 1976, según enmendada.

**El beneficio que provee la Ley Núm. 80, ante, a las partes involucradas, resulta un remedio impráctico para los trabajadores que son los que rinden, con su conocimiento y dedicación a la empresa, la plusvalía de su trabajo.** La protección de la Ley Núm. 80, supra, se ha probado que es un remedio poco efectivo para el empleado despedido sin justa causa en comparación con los beneficios que recibe la empresa al despedir al obrero.

**En los últimos años ha proliferado la práctica en las empresas privadas de despedir trabajadores sin justa causa cuando éstos llevan quince (15) o más años en la empresa.** Como tienen que compensarlo con las indemnizaciones que dispone la Ley Núm. 80, antes cita, le resulta más barato despedirlo y pagarle la mesada que mantener un empleado cuyo sueldo y retiro más cercano le redundaría en gastos mayores. **Al despedirlo, aunque cumpla con la ley, deja al empleado sin trabajo y con más de un sesenta (60) por ciento de probabilidades de no poder encontrar otro. De esa forma esta persona, en edad todavía productiva, entra a formar parte de los miles de desempleados que hacen fila para recibir ayuda gubernamental.**[11]

Más concretamente, el espíritu de esta medida se puede apreciar en los debates legislativos que se suscitaron antes de que se aprobara. Veamos una de estas expresiones legislativas:

Sr. Reyes Oppenheimer: …No se trata pues, solamente de un medio de subsistir, sino además del instrumento en virtud del cual se forma la vida familiar. Se proporciona algún bien o servicio a otros. A la vez se propicia que la persona actualice su potencial humano y se haga más persona.

Es necesario recordar la importancia vital que tienen los empleos para los trabajadores, haciendo una analogía con la esfera penal, el despido, **el despido equivale a la pena de muerte. Cuando el despido se hace en forma caprichosa, atenta a la integridad y dignidad del ser humano.**

---

[11] Énfasis nuestro. Exposición de Motivos de la Ley Núm. 128 de 7 de octubre de 2005 que enmendó la Ley Núm. 80 de 1976.

> **…La aprobación de esta medida desalentaría los despidos que se hacen de forma caprichosa y arbitraria.  En menosprecio de lo mejor que tiene nuestra economía su mano de obra.**  La compensación por despido injustificado hará un balance entre el desarrollo económico y los derechos de los trabajadores, **desalentando y penalizando la práctica de despidos arbitrarios que no tienen relación con el desempeño y las operaciones del patrono.**
>
> **Debemos entender que la política pública detrás de la mesada**, es el de disuadir el despido injustificado y no como un precio que el patrono está dispuesto a pagar por un obrero sin justificación alguna.[12]

Sin duda, la Ley 80 es reflejo del interés apremiante que tiene el Estado de evitar las prácticas injustas del trabajo en el ámbito de las relaciones obrero patronales, entorno donde la parte más débil siempre será el obrero.[13] Como toda ley laboral, está orientada a promover la justicia social de la clase trabajadora, garantizando la mayor protección de sus derechos laborales.[14]  Su esencia es remedial o reparadora, por lo cual su interpretación judicial debe ser liberal y amplia para que se puedan alcanzar los objetivos que la originaron.[15]  En este proceso

---

[12] Énfasis nuestro.  Diario de Sesiones, P. de la C. 631 que se convirtió en la Ley Núm. 128 de 7 de octubre de 2005, págs. 2-3.

[13] C. Zeno Santiago, "El Despido y la Política Social en Nuestro Estado de Derecho", 34 Rev. Jur. U.I.P.R. 213 (2000).

[14] Adventist Health v. Mercado, 2007 T.S.P.R. 100; Cintrón v. Ritz Carlton, 162 D.P.R. 32, 39 (2004).

[15] Arce Buceta v. Motorola Electrónica de PR, Inc y otros, 2008 T.S.P.R. 59; Adventist Health v. Mercado, Íd; Torres v. Gobierno de Coamo, 2007 T.S.P.R. 46; Muñiz Hernández v. Policía de Puerto Rico, 134 D.P.R. 486, 496-497 (1993);

(continúa...)

interpretativo, toda duda en cuanto a la aplicación de una disposición legal laboral deberá resolverse a favor del empleado.[16]

B. **Elementos para Activar la Causa de Acción por Despido Injustificado**

Para que una persona pueda reclamar ante un foro judicial que fue despedida injustificadamente y, por lo tanto, llevar una acción bajo la Ley 80 tiene que alegar en su querella que: (1) era empleada de comercio, industria o cualquier otro negocio o sitio de empleo;[17] (2) estaba contratada sin tiempo determinado; (3) recibía una remuneración; (4) fue despedida de su cargo; y (5) no medió una justa causa.[18] Limitaré mi discusión a los últimos dos

---

Martínez Reyes v. Tribunal Superior, 104 D.P.R. 407, 411 (1975). Véase, además, R.E. Bernier y J.A. Cuevas Segarra, Aprobación e Interpretación de Leyes en Puerto Rico, Segunda Edición Revisada, Publicaciones J.T.S., 1987, Vol. 1, pág. 455; C. Zeno Santiago y V. Bermúdez, *op.cit.*, págs. 27, 94; R. N. Delgado Zayas, *op.cit.*, pág. 15.

[16] Arce Buceta v. Motorola Electrónica de PR, Inc y otros, *supra*; Adventist Health v. Mercado, *supra*; Torres v. Gobierno de Coamo, *supra*; García v. A.E.E.L.A., 2007 T.S.P.R. 29; Jiménez v. General, 2007 T.S.P.R. 13; Piñero v. A.A.A., 146 D.P.R. 890, 901-902 (1998). Véase, además, Acevedo v. PR Sun Oil Co., 145 D.P.R. 752 (1998); Beuchamp v. Holsum Bakers, 116 D.P.R. 522 (1985); Sec. del Trabajo v. ITT, 108 D.P.R. 536 (1979).

[17] En el caso Hull Dobbs Co. v. Tribunal Superior, 82 D.P.R. 77, 84-85 (1961), interpretando la Ley Núm. 50, este Tribunal determinó que los ejecutivos, profesionales y administradores están protegidos por la Ley Núm. 80 de 1976.

[18] Artículo 1, Ley Núm. 80, *supra*, 29 L.P.R.A. sec. 185a; García v. Aljoma, 162 D.P.R. 572, 585 (2004); Díaz v.
(continúa...)

elementos porque en este caso no existe controversia sobre ninguno de los primeros tres requisitos.

En el marco de las relaciones obrero patronales el despido se entiende como "la ruptura o disolución del contrato o relación de trabajo por declaración de voluntad unilateral del patrono o empresario, que de tal modo extingue el vínculo que lo une con el trabajador a su servicio".[19] Este concepto se visualiza ampliamente en la Ley 80 porque, además de establecer lo que constituye un despido clásico o tradicional, el estatuto incluye "otras acciones que, por sus efectos, equivalen a despidos".[20] Específicamente, la medida conceptúa el término despido de la siguiente manera:

> …se entenderá por despido, **además de la cesantía del empleado, su suspensión indefinida o por un término que exceda de tres (3) meses**, excepto en el caso de empleados de industria y negocios estacionales **o la renuncia del empleo motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar tales como imponerle o intentar imponerle condiciones de trabajo más onerosas**, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra.[21]

---

Wyndham Hotel Corp., *supra*, pág. 375. Véase, además, C. Zeno Santiago y V. Bermúdez, *op.cit.*, pág. 98.

[19] G. Caballenas de Torres, Diccionario de Derecho Laboral, Heliasta, S.R.L., Buenos Aires, Argentina, 1998, pág. 200.

[20] C. Zeno Santiago, "El Despido y la Política Social en Nuestro Estado de Derecho", *supra*, pág. 215.

[21] Énfasis nuestro. Artículo 5, Ley Núm. 80 de 1976, supra, 29 L.P.R.A. sec. 185e.

De este texto se pueden visualizar tres modalidades de despidos: (1) el tradicional, (2) la suspensión, y (3) la renuncia obligada provocada por el patrono. En lo pertinente, la tercera modalidad de despido, conocida como tácito o "constructivo",[22] es una ficción legal porque permite que una renuncia sea tratada por los tribunales como un despido explícito, siempre que ésta sea el resultado de cambios severos en las condiciones de trabajo de un empleado. En otras palabras, el foro judicial infiere la existencia de un despido, a partir de la conducta ilícita del patrono.

Esta figura jurídica tiene su origen en el derecho común donde se le denominó como "constructive discharge".[23] La misma se comenzó a utilizar en controversias de relaciones obrero-patronales bajo la Ley Nacional de Relaciones del Trabajo de los Estados Unidos (NLRA, por sus siglas en inglés).[24] Concretamente, la Junta Nacional de

---

[22] A este término jurídico, además, se le conoce como despido constructivo, abandono constructivo o despido implícito.

[23] C. Zeno Santiago y V. M. Bermúdez Pérez, *op.cit.*, pág. 100.

[24] 29 U.S.C. secs. 151-169; G. W. Bohlander, "Constructive Discharge-A.K.A. Was It a Quit or Discharge? Understanding The Doctrine and Prevention of Constructive-Discharge-Discharge Cases", J. Individual Employment Rigths, Vol. 8 (1), 1999-2000, pág. 49.

Esta ley trataba de impedir que se discriminara, en la contratación o la tenencia de un empleo, contra aquellos empleados que querían formar, asistir o apoyar la organización de un sindicato, o intentaban negociar colectivamente mediante sus representantes. 29 U.S.C. sec. 158 (a) (3). De esta forma, los patronos podrían ser

(continúa...)

Relaciones del Trabajo (NLRB, por sus siglas en inglés) utilizó, por primera vez, el término despido constructivo en 1938,[25] aunque no fue hasta 1976 que se elaboraron los dos elementos necesarios para que se configurara la causa de acción por despido constructivo. Ese año, la NLRB determinó que para reclamar un despido constructivo, en el contexto de relaciones laborales colectivas, era necesario probar: (1) que las condiciones impuestas por el patrono eran de tal naturaleza que obligaban al empleado a renunciar y (2) que esta carga onerosa se imponía por las acciones sindicales del empleado.[26]

---

encontrados culpables de cometer prácticas ilícitas configurando un despido constructivo, contra los empleados unionados, bajo las secciones 8 (a) (3) y 8 (a) (1). 29 U.S.C. 158 (a) (1) y (a) (3). En esta última sección, los cargos se referían a intentos del patrono de interferir, restringir o ejercer coerción contra los empleados que ejercían los derechos que le concedía el estatuto. G. W. Bohlander, *op.cit.*, págs. 49-50.

[25] Sterling Corset Co., Inc., 9 N.L.R.B. 858, 865 (1938), citado en Pennsylvania State Police v. Nancy Drew, 542 U.S. 129, 141-143 (2004); I. M. Saxe. "Constructive Discharge Ander the ADEA: An argument for the intent Standard." Fordham Law Review, Vol. 55, Núm. 6 (May 1987), págs. 963-1001.

[26] "There are two elements which must be proven to establish a constructive discharge. First, the burdens imposed upon the employee must cause, and be intended to cause, a change in his working conditions so difficult or unpleasant as to force him to resign. Second, it must be shown that those burdens were imposed because of the employee's union activities." Crystal Princeton Refining Co., 222 N.L.R.B. 1068 (1976), según citado en G. W. Bohlander, *op.cit.* pág. 50. Véase, además, Sure-Tam, Inc. v. N.L.R.B., 467 U.S. 883 (1984) donde el Tribunal Supremo federal afirma que el intento de un patrono de forzar la renuncia de su empleado es un elemento significativo en determinar los resultados de los casos de despido constructivo atendidos por la Junta. G. W. Bohlander, *op.cit.*, pág. 50. En este caso, el Tribunal

(continúa...)

Esta doctrina evolucionó y se amplió su aplicación a todo tipo de controversias de despidos ilegales, particularmente los relacionados con discrimen bajo el Título VII de la Ley de Derechos Civiles.[27] Por ejemplo, despidos relacionados con discrimen por sexo, edad, raza, religión, hostigamiento sexual, entre otros. En este contexto, los tribunales estatales y federales han elaborado dos estándares para aplicar la doctrina de despido constructivo a controversias de discrimen. Éstos son: (1) el de la persona razonable (Reasonable Person Standard) y (2) el de la intención patronal (Employer Intent Standard). De acuerdo al profesor George W. Bohlander, hay una tendencia mayoritaria entre los tribunales apelativos federales para favorecer el primer estándar.[28] Inclusive, el Tribunal Supremo de los Estados Unidos ha aceptado el

---

Supremo de los Estados Unidos avaló el despido constructivo en el contexto laboral, según establecido por la NLRB. De esta forma, siguió el patrón establecido por los tribunales estatales y federales.

[27] Equal Employment Opportunities Act, Civil Rigths Act of 1964, 42 U.S.C.A. sec. 2000e et seq.; G. W. Bohlander, _Íd._, págs. 50-51; Pennsylvania State Police v. Nancy Drew, _supra_; Howard E. Sullivan III. "Labor Law, Employment discrimination: Employer that knowingly permits acts of discrimination so intolerable that reasonable employee subject to them would resign may be liable for Constructive Discharge under Title VII." Villanova Law Review, Vol. 30, Núms. 3-4 (June, 1985). págs. 1028-1039.

[28] El estándar de la persona razonable es aceptado por los distritos Primero, Segundo, Tercero, Quinto, Sexto, Noveno, Décimo, Undécimo y el de Columbia. Mientras, el estándar de la intención patronal sólo es apoyado por el cuarto y octavo circuito de apelaciones. G. W. Bohlander, _op. cit._, pág. 51.

estándar de la persona razonable como el apropiado para adjudicar controversias de despido constructivo en el contexto de discrimen.[29]

Bajo el estándar de persona razonable basta probar que las acciones del patrono inducen al empleado a renunciar antes que aceptar las condiciones onerosas o intolerables impuestas. Específicamente, en los casos de discriminación ilegal, en los que se reclame el despido constructivo, se debe establecer un nexo entre el acto discriminatorio y las condiciones intolerables de trabajo impuestas por el patrono. En ausencia de este nexo, aunque se demuestre el acto de discriminación ilegal, no se sostendrá automáticamente el reclamo de despido constructivo.[30]

---

[29] Pennsylvania State Police v. Nancy Drew, *supra*, págs. 133-134; 147, citando, también, a Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), Faragher v. Boca Raton, 524 U.S. 775 (1998).

[30] G. W. Bohlander, *op. cit.*, pág. 55, citando a Heagney v. University of Washington, 26 Fair Employment Practice Case, 438 (9th Cir. 1981).

Los tribunales estatales y federales han definido el concepto de condiciones de trabajo intolerable como aquellas condiciones de empleo onerosas, impuestas por el patrono, que son insoportables para cualquier persona razonable y que le fuerza a renunciar involuntariamente. Estas condiciones onerosas se concretizan cuando el patrono, en vez de crear condiciones razonables de empleo, coloca al empleado en la disyuntiva de aceptar las condiciones intolerables impuestas a sus condiciones de trabajo o renunciar. En esta situación es perfectamente comprensible que un empleado anticipe el daño que pueden ocasionarle las condiciones onerosas previstas para un futuro cercano y decida renunciar antes de someterse a las nuevas condiciones de trabajo impuestas por su patrono. Meyer v. Brown and Root Construction Co., 661 F. 2d 369 (5th Cir. 1981), citado en G. W. Bohlander, *op. cit.*, pág. 53.

Distintamente, bajo el estándar de intención patronal se requiere que el empleado querellante, además de probar que las condiciones de trabajo son intolerables para una persona razonable, establezca que subyacente a las acciones del patrono está la intención de forzar el despido. Nada impide, sin embargo, que ello se pueda probar a través de las inferencias a las que llegue el tribunal al aquilatar la prueba.[31]

Este Tribunal ha interpretado la doctrina de despido constructivo de forma similar al estándar de persona razonable utilizado por los foros judiciales de Estados Unidos. Concretamente, desde 1967, hemos establecido que

---

[31] G. W. Bohlander, *Íd.*, pág. 55, citando a Paroline v. Unisys Corp., 879 F.2d 100, 114 (4th Cir. 1989). Actualmente, aun bajo el estándar de intención patronal, para probar la intención del patrono de despedir al empleado no es necesario demostrar que el patrono conscientemente intentaba forzar al empleado a renunciar. Por lo cual, cuando un patrono niega que conscientemente esté tratando de hacer que su empleado renuncie, al patrono necesariamente se le debe adjudicar la intención de esperar la consecuencia razonablemente previsible de sus actuaciones. Martin v. Cavalier Hotel Corp., 48 F. 3d 1343 (4th Cir. 1995); Hukkanen v. International Union of Operating Engineers, 3 F. 3d 281 (8th Cir. 1993); Deer v. Gula Oil Corp., 796 F. 2d 340 (10th Cic. 1986), todos citados en G. D. Mesritz. "Constructive Discharge and Employer Intent: Are the Courts Split over a Distinction without a Difference?", Employee Relations Law Journal, Vol. 21, No. 4, Spring 1996, pág. 92-94.

Esto básicamente elimina la distinción entre el estándar de persona razonable y el de intención patronal porque ambas utilizan un examen objetivo. El primero basado en la razonabilidad del empleado que renuncia y el segundo en que la renuncia sea una consecuencia razonablemente previsible a las acciones del patrono. En otras palabras, el despido constructivo se configura cuando el patrono podía razonablemente prever las consecuencias de sus acciones. George D. Mesritz., *Íd.*, pág. 92, 102

"los actos voluntarios e injustificados de un patrono, encaminados a obligar al empleado a dejar su cargo, constituyen un despido **cuando la única alternativa razonable que queda al empleado es la de abandonar el cargo**".[32]   Los profesores Zeno García y Bermúdez Pérez coinciden con esta apreciación al expresar que "…se entenderá que ha ocurrido este tipo de despido, **siempre que una persona razonable ante circunstancias similares sienta que se le está forzando a renunciar** y no de acuerdo a la visión subjetiva que pudiese tener el empleado individualmente".[33]

El Departamento del Trabajo y Recursos Humanos (Departamento del Trabajo) adoptó esta definición jurisprudencial y la estructuró en dos elementos principales:

1) Las acciones del patrono deben exhibir un nivel de seriedad considerable.

2) El empleado no debe tener disponible otra alternativa que no sea la renuncia para resolver la situación adversa que enfrenta en el trabajo.[34]

Respecto al segundo requisito, el Departamento del Trabajo aclara que se activa una excepción a la norma general que

---

[32] Vélez de Reilova v. R. Palmer Bros., Inc., 94 D.P.R. 175, 178 (1967).   Véase, además, Nazario v. E.L.A., 159 D.P.R. 799, 810 (2003); S.L.G. Hernández-Beltrán v. TOLIC, 151 D.P.R. 754, 777 (2000); Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 183 (1994).

[33] Énfasis nuestro. C. Zeno Santiago y V. M. Bermúdez Pérez, *op.cit.*, pág. 100.

[34] Departamento del Trabajo y Recursos Humanos, "Guía Revisada para la Interpretación y Aplicación de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada", 2000, pág. 22.

requiere agotar alguna opción razonable, antes de tomar la determinación de renunciar, cuando "la acción del patrono crea una condición de riesgo para la vida o la salud, tanto mental como física del empleado".[35] Ante esta consideración, "no resulta necesario agotar el remedio existente si el mismo no garantiza la eliminación inmediata de dicho riesgo".[36]

Como es observable, no cualquier molestia, condición antipática o circunstancia estresante en el empleo puede cualificar como un despido tácito, de forma que el trabajador quede protegido por el remedio que provee la Ley 80. Es necesario que las actuaciones del patrono, ya sean cambios onerosos en las condiciones de trabajo, traslados, reducciones de salarios o descenso en el puesto, sean arbitrarias, irrazonables y caprichosas.[37] Además, deben ser situaciones que le creen al empleado un ambiente de trabajo hostil, intimidante u ofensivo, que no estén fundamentadas "en gestiones administrativas legítimas" y que lesionen sus condiciones de trabajo.[38] **Para el profesor Bohlander un ejemplo de una condición de trabajo intolerable es trasladar a un empleado aumentándole marcadamente el tiempo requerido**

---

[35] Departamento del Trabajo y Recursos Humanos, *Íd.*

[36] Departamento del Trabajo y Recursos Humanos, *op.cit.*

[37] Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178, 198, 208-209 (1998).

[38] Departamento del Trabajo y Recursos Humanos, *op.cit.*, pág. 23.

**para llegar a su lugar de trabajo.**[39] Los profesores Baxter y

Farrell coinciden con esta apreciación y proveen otros

criterios que deben ser ponderados para determinar si la

renuncia provocada por un traslado puede constituir un

despido constructivo. Específicamente, los profesores

exponen:

> In determining whether a proposed transfer or
> demotion constitutes conditions intolerable enough
> to support a finding of constructive discharge by
> an employee who leaves a job, courts will compare
> the offered job with the job the employee had. The
> comparison will focus on differences in pay and
> benefits, as well as other day to day conditions,
> increased travel requirements, increased commuting
> time, etc. Courts will also consider whether the
> transfer or demotion constitutes a blow to one's
> prestige or involves embarrassment (although these
> factors will not constitute an intolerable
> condition unless their effect is great). In
> evaluating embarrassment claims, courts seek to
> find out whether the embarrassment would be daily
> and unavoidable and whether there is a radical
> change in job responsabilities (e.g., taking away
> an employee's responsibility for policy-making
> decisions). Courts emphasize that the standard for
> evaluating claims of intolerable working conditions
> caused by a transfer or demotion is an objective
> one, and that mere dislike of the new job is not a
> difficult or unpleasant enough condition that a
> person is privileged to quit.[40]

Concretamente, para determinar si hay un despido

implícito, primero, la prueba debe demostrar, "mediante

inferencia razonable, que la única alternativa razonable del

empleado es abandonar su empleo", como lógico resultado de

las condiciones de trabajo intolerables, irrazonables,

---

[39] G. W. Bohlander, *op. cit.*, pág. 54.

[40] R. H. Baxter Jr. y J. M. Farell. "Constructive Discharge:
When Quitting Jeans Getting Fired", Employee Relations Law
Journal, Vol. 7, págs. 352-353.

injustas y a tal punto onerosas que le impuso su patrono.[41]
Ante estas circunstancias, el empleado, como persona
razonable, prefiere renunciar que tolerar las desfavorables
condiciones de trabajo impuestas. Es decir, la renuncia del
empleado debe considerarse como una consecuencia
razonablemente previsible de las acciones del patrono.

Otro elemento a considerar es si el patrono puede
justificar su actuación. Esto implica que el patrono debe
probar que no tenía otras alternativas menos onerosas para
ofrecerle al empleado que no le resultaran perjudiciales al
normal funcionamiento de su negocio. Como regla general, si
el patrono no logra justificar su actuación, este tipo de
despido será injustificado.[42] Al examinar este factor, el
Tribunal debe partir de la premisa de que los patronos son
personas razonables en la toma de decisiones en su empresa.[43]

---

[41] C. Zeno Santiago y V. M. Bermúdez Pérez, *op.cit.*, pág.
102; C. Zeno Santiago, "El Despido y la Política Social en
Nuestro Estado de Derecho", *op.cit.*, pág. 219. Véase,
además, R. H. Baxter Jr. y J. M. Farell, *op.cit.*, págs. 346-
368.

[42] R. Delgado Zayas, *op.cit.*, pág. 122.

[43] En un contexto de despido constructivo por discrimen, el
Tribunal Supremo de los Estados Unidos expresó:

> We know from our experience that more often than
> not people do not act in a totally arbitrary
> manner, without any underlying reasons, especially
> in a business setting. Then, when all legitimate
> reasons… have been eliminated as possible reasons
> for the employer's actions, it is more likely than
> not the employer, who we generally assume acts only
> with some reason, based his decision on an
> impermissible consideration… Furnco Construction
> Corp. v. Waters, 438 U.S. 567, 577 (1978).

El Departamento del Trabajo sugiere algunas circunstancias que, de acuerdo a la situación fáctica del caso, pueden examinarse para determinar si la actuación del patrono es razonable y justificada. Éstas son: "(1) [l]a condición económica de la empresa, (2) [l]os cambios tecnológicos o de cualquier otra forma que se han realizado en la empresa, (3) [e]l desempeño y la eficiencia del empleado en su puesto, (4) [e]l nivel de compensación del empleado, especialmente si se le compara con empleados que ocupan una posición similar en la empresa o en otras empresas similares, (5) [l]as condiciones de trabajo de los demás empleados de la empresa y especialmente de los empleados que ocupan una posición similar, (6) [a]ntigüedad del empleado."[44] Cada una de estas consideraciones representa las posibles razones que el patrono puede utilizar para justificar su actuación.[45]

En el caso ante nuestra consideración, para definir si la actuación de trasladar a la señora Figueroa Rivera fue justificada y razonable se deben evaluar, principalmente, tres factores: (1) la condición económica de El Telar y la decisión de cierre, (2) la reducción parcial de personal y (3) el elemento de la antigüedad.[46] En este examen, la prueba

---

[44] Departamento del Trabajo y Recursos Humanos, *op.cit.*, pág. 23.

[45] Departamento del Trabajo y Recursos Humanos, *Íd.*

[46] No comparto la conclusión a la que llega la opinión de conformidad referente a que en la ponderación de si un despido es constructivo, además del elemento de la
(continúa...)

ofrecida por el patrono nos debe llevar a concluir que no tenía otra alternativa menos onerosa que beneficiara a la empleada y que no le afectara el funcionamiento de su negocio. Es decir, tenemos que concluir que el patrono cumplió con la Ley 80. **Si el patrono no logra demostrar su cumplimiento, será responsable por despido constructivo y tendrá que pagar la "mesada".**

Varias de las situaciones señaladas por el Departamento, para determinar la razonabilidad y justificación de la actuación patronal, surgen de las circunstancias particulares que la Ley 80 menciona como posibles causas justificadas para el despido. Éstas se sustentan en la prerrogativa que tiene el patrono de despedir a un trabajador, siempre que el despido obedezca a una razón gerencial y no sea producto de su arbitrariedad y capricho. Sobre este particular, la normativa específicamente dispone que será justa causa para el despido de un empleado lo siguiente:

---

onerosidad y de la renuncia como única opción, se deben evaluar cada uno de los factores que el Departamento del Trabajo y Recursos Humanos menciona para establecer si fue válida la actuación del patrono. Esta información que provee el Departamento sólo son guías interpretativas de la Ley Núm. 80 de 1976, supra. No es un reglamento aprobado con el rigor que exige la Ley de Procedimiento Uniforme (LPAU), 3 L.P.R.A. sec. 2101 et. seq., y validado por el Departamento de Estado que resulte obligatorio al momento de adjudicar una controversia. Por lo cual, la mayoría, al utilizar estas guías, debe analizarlas y aplicarlas en congruencia con los hechos del caso y la finalidad de la Ley Núm. 80 de 1976, según enmendada, que es proteger la tenencia del empleo.

a. Que el obrero siga un patrón de conducta impropia o desordenada.

b. La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.

c. Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

d. Cierre total, temporero o parcial de las operaciones del establecimiento.

e. Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios rendidos al público.

f. Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.[47]

Las primeras tres situaciones son provocadas por la conducta del empleado. Mientras, las próximas tres son actuaciones del patrono, motivadas por razones económicas, dirigidas a la administración de su negocio. **Ambos grupos de causales deben estar vinculadas al buen y normal funcionamiento de la empresa para que el despido sea considerado con justa causa.** Al respecto, la normativa dispone que no se considerara justificado un despido que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento.[48]

---

[47] Artículo 2, Ley Núm. 80 del 30 de mayo del 1976, *supra*, 29 L.P.R.A. sec. 185b.

[48] Artículo 2, Ley Núm. 80, supra; Díaz v. Wyndham Hotel Corp., *supra*, págs. 376-377; Srio. del Trabajo v. G.P. Inds., Inc., 153 D.P.R. 223, 244 (2001); Secretario del Trabajo v. I.T.T., supra, pág. 543; Báez García v. Cooper
(continúa...)

La controversia de este caso se centra en las causales (d) y (f). Es decir, en el cierre de algunas tiendas de El Telar, en la reducción de personal por motivo del cierre y en un alegado despido constructivo por el diseño e implantación arbitraria y caprichosa de un estudio de antigüedad para hacer efectivo los cierres. En cuanto a esto, la Ley 80 dispone que:

> En cualquier caso en que se despidiesen empleados por las razones indicadas en los incisos (d), (e) y (f) de la sec. 185b de este título, **el patrono estará obligado a retener con preferencia en el empleo a los empleados de más antigüedad siempre que subsistan puestos vacantes u ocupados por empleados de menos antigüedad en el empleo dentro de su clasificación ocupacional** que puedan ser desempeñados por ellos, entendiéndose que se dará preferencia a los empleados despedidos en caso de que dentro de los seis (6) meses siguientes a su cesantía tuviere necesidad de emplear a una persona en labores iguales o similares a las que desempeñaban dichos empleados al momento de su despido y dentro de su clasificación ocupacional siguiéndose también el orden de antigüedad en la reposición excepto, y en ambas situaciones, en aquellos casos en que haya una diferencia clara o inconcursa en favor de la eficiencia o capacidad de trabajadores comparados en cuyo caso prevalecerá la capacidad.[49]

**Este precepto establece, como un derecho, la retención de todo empleado que tenga mayor antigüedad en la empresa.** Por lo cual, para que la acción del patrono de cerrar y reducir personal sea justificada y, por ende, válida, éste

---

Labs., Inc., 120 D.P.R. 145, 154 (1987). Véase, además, C. Zeno Santiago y V. M. Bermúdez Pérez, *op.cit.*, pág. 107; A. Acevedo Colom, Legislación Protectora del Trabajo Comentada, Séptima Edición Revisada; San Juan: Ramallo Printing, 2001, pág. 135.

[49] Artículo 3, Ley Núm. 80 de 1976, supra, 29 L.P.R.A. sec. 185c.

deberá respetar el orden de antigüedad de los trabajadores. Para cumplir con esta obligación, el patrono debe utilizar su prerrogativa gerencial de diseñar un estudio de antigüedad. **Este plan de antigüedad no puede ser contrario a la finalidad de la Ley 80 que es proteger la tenencia de empleo de aquellos trabajadores que tienen más tiempo laborando en la empresa.** Esto porque el estatuto presume que al aplicar o implantar sus disposiciones el patrono va actuar sin arbitrariedad o capricho.

Para calcular la antigüedad del empleado, la Ley 80 establece dos criterios. Según el primero, los años de servicios se computan tomando en consideración el tiempo en la oficina, fábrica, sucursal o planta donde se va hacer la reducción de personal, porque los empleados no son trasladados entre componentes de la empresa y cada uno de éstos funciona de manera independiente en términos de los asuntos de personal. El segundo criterio toma en consideración el tiempo invertido en todas las oficinas, fábricas, sucursales o plantas dentro de la clasificación ocupacional donde se va hacer la reducción de personal, porque son usuales los traslados de empleados entre unidades y se opera de forma integrada en cuanto a los aspectos de personal.[50] Este segundo criterio es el que le aplica a la controversia que está ante nuestra consideración. Por eso, para determinar la antigüedad de sus empleados, El Telar

---

[50] Artículo 3, Ley Núm. 80 de 1976, *Íd.*

consideró todo el tiempo que éstos llevaban laborando en la compañía.

Claro está, la ley también establece que se podrá utilizar el criterio de eficiencia o capacidad, tanto en el orden de los despidos como en la retención, siempre que exista una diferencia clara que lo justifique.[51] En ese sentido, el criterio de "eficiencia o capacidad reviste un valor secundario al de la antigüedad".[52] De acuerdo al Departamento del Trabajo, esta conclusión:

> …obedece al hecho de que cuando un grupo de personas se han desempeñado por un período de tiempo en una clasificación ocupacional, se entiende que todos cumplen en términos generales con los requisitos para ocupar la plaza cubriendo unos niveles mínimos de excelencia. Por lo tanto, si la acción del patrono sólo consiste en una reducción de la

---

[51] Para esto, el patrono tendrá que someter evidencia que demuestre que:

1. Ha utilizado un mecanismo de evaluación razonable, el cual mide de forma apropiada y objetiva la capacidad del empleado para realizar las funciones del puesto.

2. De las evaluaciones realizadas surge una diferencia clara o inconcursa a favor de la eficiencia o capacidad de ciertos empleados.

3. Las funciones del puesto son de tal naturaleza que la diferencia en términos de la capacidad o eficiencia de los empleados conlleva una diferencia sustancial en términos económicos para la empresa y quizás en la capacidad de subsistencia de la misma. Departamento del Trabajo y Recursos Humanos, *op.cit.*, 41. Véase, además, C. Zeno Santiago y V. Bermúdez, *op.cit.*, págs. 132-133.

4.

[52] Departamento del Trabajo y Recursos Humanos, *op.cit.*, pág. 40.

fuerza obrera, entonces el requisito que como norma regula el orden preferente de cesantía y reempleos es la antigüedad.[53]

**En este caso, El Telar no alegó ni probó que era necesario sustituir el criterio de antigüedad por el de capacidad o eficiencia.** Por lo tanto, al evaluar la implantación del estudio de antigüedad, con relación a la señora Figueroa Rivera, será necesario observar si el patrono cumplió con la finalidad de la Ley 80 que persigue retener en el puesto a los empleados de mayor antigüedad.

Inmediatamente se cumple con cada uno de los requisitos previamente mencionados, es decir, ser un empleado de negocio, a tiempo indeterminado, con remuneración y despedido sin justa causa, se activa en el proceso judicial una presunción legal de que el despido es ilegal o injustificado.[54] Esta regla fue reafirmada por la Asamblea Legislativa en una de las enmiendas realizadas a la Ley 80.

> Dicha legislación tuvo el propósito de conferir mayor protección en el empleo a los trabajadores, al establecer una presunción, rebatible, de despido injustificado y el derecho a una indemnización, conocida comúnmente como "mesada", en aquellas situaciones en las que el patrono no pudiese establecer, a satisfacción del Tribunal, la existencia de justa causa para el despido.[55]

---

[53] Departamento del Trabajo y Recursos Humanos, *Íd.*

[54] Artículo 8, Ley Núm. 80, supra, 29 L.P.R.A. sec. 185k; Díaz v. Wyndham Hotel Corp., *supra*, pág. 378; Baez García v. Cooper Labs., Inc., 120 D.P.R. 145, 151-152 (1987). Véase, además, "L. O. Meléndez Dones, Esquemas Probatorios: El Discrimen Intencional al amparo de la Ley Núm. 100 y el Título VII", 34 Rev. Jur. U.I.P.R. 239, 251 (2000).

[55] Exposición de Motivos de Ley Núm. 95 de 30 de julio de 2007.

(continúa...)

Ante esta presunción, al contestar la demanda el patrono tiene la obligación de alegar "los hechos que dieron origen al despido y probar que el mismo estuvo justificado", de manera que pueda quedar exento de la responsabilidad económica que le impone la Ley 80 a todo patrono que despide sin justa causa a un empleado.[56] Esto significa que, contrario a la norma general, **en los casos donde se levante la causa de acción por despido injustificado bajo la Ley 80 será el patrono y no el reclamante quien tendrá el peso de la prueba para establecer que el despido fue justificado.**[57]

Las Reglas de Evidencia claramente disponen que, en los casos civiles, si la persona contra la cual se establece la presunción no presenta evidencia para rebatir el hecho presumido, el juzgador viene obligado a deducirlo, quedando tal hecho establecido. Por el contrario, si la parte contra la cual se establece la presunción, presenta evidencia en apoyo de la determinación de la no existencia del hecho, la parte a la cual le favorece la presunción debe persuadir al juzgador de que el hecho presumido sí existe.[58]

---

[56] Artículo 8, Ley Núm. 80, 29 L.P.R.A. sec. 185k(a).

[57] Díaz v. Wyndham Hotel Corp., supra, págs. 378-379, 388; Belk v. Martínez, 146 D.P.R. 215, 231 (1998); Secretario del Trabajo v. I.T.T., *supra*, pág. 543; A. Acevedo Colom, *op.cit.*, pág. 192. Véase, además, Regla 10 de Evidencia, 32 L.P.R.A. Ap. IV, R.10.

[58] Regla 14 de las de Evidencia, 32 L.P.R.A. Ap. IV.

La carga probatoria del patrono para rebatir la presunción de despido injustificado, es decir, para demostrar la inexistencia del hecho presumido, será el de preponderancia.[59] En ese sentido, **el patrono tiene la obligación de probar y persuadir al juzgador respecto a que el despido fue justificado.**[60] Si el patrono revierte esta presunción, el empleado tiene que presentar prueba de refutación para establecer que el despido fue injustificado.[61] Si el empleado no logra probar que se trató de un despido injustificado, el patrono prevalece y se libera del pago de la mesada. Por el contrario, **si el patrono no cumple con la carga probatoria, el foro judicial tiene que concluir que el despido fue arbitrario y capricho, es decir, injustificado.**

Concretamente, **en un caso donde un empleado alegue que su renuncia debe considerarse un despido constructivo, el patrono debe alegar y probar que su actuación fue razonable, justificada y que no tenía otras alternativas menos onerosas que ofrecer al empleado y que, a la vez, no impidieran el normal funcionamiento de su negocio.** Lo particular de esta modalidad de despido es que sólo se activa cuando, entre otros factores, se concluye que la actuación del patrono fue injustificada. **Dentro del mismo concepto jurídico, contrario**

---

[59] Díaz v. Wyndham Hotel Corp., *supra*, pág. 378; Rivera Águila v. Kmart de P.R., 123 D.P.R. 599, 610 (1989); Secretario del Trabajo v. I.T.T., *supra*, pág. 543 (1979).

[60] Ibanez v. Molinos de P.R., Inc., 114 D.P.R. 42, 53 (1983).

[61] Belk Arce v. Martínez, *supra*, pág. 231-232.

**a las otras variantes de despido, está inmerso su rechazo a lo injustificada o arbitraria de la acción realizada por el patrono. Por lo cual, si se establece que hay un despido constructivo, será obligatorio concluir que el mismo es injustificado.**

### III

En este caso se ha configurado un despido constructivo. Basta con examinar brevemente el expediente para darse cuenta de esto. La señora Figueroa Rivera no fue separada de su puesto de gerente y de su empleo de forma tradicional, es decir, no hubo un despido explícito en el que El Telar unilateralmente le manifestara que quedaba cesante de su puesto. **La señora Figueroa Rivera renunció a su trabajo, después de 18 años en la compañía El Telar, no por su gusto, sino porque las nuevas condiciones de trabajo impuestas por su patrono eran intolerables.** En este caso, es necesario establecer si su renuncia constituye un despido implícito o tácito provocado por las acciones y decisiones de su patrono. Es decir, **se necesita determinar si la actuación de El Telar de trasladarla de Guayama a Mayagüez para realizar su trabajo le resultó onerosa, si su única opción razonable era renunciar y si el patrono tenía otras alternativas menos onerosas que evitaran su determinación.** Si el patrono no tenía otras alternativas estamos en la obligación de considerar que se trató de una medida legítima y justificada. Por el contrario, si tenía otras alternativas entonces su determinación fue caprichosa e injustificada.

Este análisis se realiza para discernir si la señora Figueroa Rivera tiene derecho a la mesada y a la indemnización progresiva que concede la Ley 80. **En nuestro caso, el análisis revela que, efectivamente, su despido fue injustificado.**

La señora Figueroa Rivera reside en el pueblo de Guayama, lugar donde también trabajaba en la tienda El Telar. Su renuncia fue provocada porque El Telar, al cerrar la tienda de Plaza Guayama, lugar en el que laboraba como gerente, determinó que sería trasladada como gerente a la tienda del pueblo de Mayagüez y que de no aceptar tendría que renunciar.

Es obvio que la determinación unilateral de El Telar resulta onerosa para la señora Figueroa Rivera. Antes, la señora Figueroa Rivera llegaba a su trabajo desde su casa en aproximadamente 10 minutos. Ahora, con su traslado, El Telar le impone a la señora Figueroa Rivera alguna de las siguientes acciones: (1) vender su casa en el pueblo de Guayama y reubicar su residencia en Mayagüez, o (2) alquilar otra residencia en Mayagüez, o (3) viajar entre 2 ½ y 3 horas desde su casa hasta su trabajo y viceversa.

Si la señora Figueroa Rivera optara por viajar todos los días, esto significaría la inversión de por lo menos 5 horas diarias en transportación, tendría que gastar una cantidad significativa de su sueldo en combustible y en el mantenimiento de su vehículo para que éste se encuentre en condiciones óptimas para transitar. Además, la cantidad de

horas invertidas en viajar le restaría al tiempo que la señora Figueroa tiene para descansar y ciertamente aumentaría su cansancio físico, lo cual puede afectar, a su vez, sus relaciones con sus familiares, las responsabilidades en el hogar e inclusive en su trabajo, entre otros. También, el mantenerse más tiempo conduciendo, aumenta la posibilidad de que la señora Figueroa Rivera pueda tener un accidente en la carretera.

De igual forma, si la señora Figueroa Rivera optara por cualquiera de las otras formas para reorganizar su vida, mencionadas anteriormente, todas serían igualmente onerosas tanto para ella como para toda su familia. Por eso, **este traslado representa un cambio sustancial y severo en las condiciones de trabajo y la vida de la señora Figueroa Rivera**. Sin duda, la inversión de recursos económicos para trabajar haría insignificante la remuneración que ésta recibe, que de hecho es el salario mínimo, $7.50 la hora. **Esto no es una mera molestia o situación antipática, es la destrucción de la estabilidad emocional, económica y laboral de esta empleada.**

Ante la disyuntiva impuesta por su patrono, ¿tenía otra alternativa razonable la señora Figueroa Rivera, más allá de renunciar? Es evidente que no. **El telar la indujo a renunciar y así se lo hizo ver cuando le entregó un documento donde le informaba su reubicación y le solicitaba que manifestara si iba aceptar el traslado. Si no lo**

**aceptaba, tenía que entregar su carta de renuncia.[62] La determinación de la señora Figueroa Rivera de renunciar a su puesto es la que tomaría cualquier persona razonable en su situación y es un resultado previsible a las determinaciones de su patrono de imponerle un traslado oneroso.** Al hacer sus condiciones de trabajo intolerables, El Telar la indujo a renunciar. De esa forma, **se configura un despido constructivo que por sus características resulta injustificado, caprichoso e impermisible a la luz de la doctrina laboral porque, como veremos, el patrono tenía varias alternativas que ofrecerle a la Sra. Figueroa Rivera.**

Luego de establecer que la actuación voluntaria de El Telar de trasladar a la señora Figueroa Rivera para Mayagüez representó para ésta una condición en extremo onerosa y determinar que su única opción viable era la renuncia, es necesario examinar si la actuación del patrono es justificada y razonable. Esto tomando en consideración si El Telar no tenía otras alternativas menos onerosas que no fueran incompatibles con el normal funcionamiento de su negocio. Al evaluar este aspecto, el Tribunal debe partir de la premisa de que los patronos actúan de forma razonable cuando toman decisiones que impactan su negocio.

El Telar tuvo que cerrar algunas de sus tiendas por motivos económicos. Esto ocasionó que tuviera que reducir su

---

[62] Énfasis nuestro. Apéndice del recurso de *certiorari*, "Decisión referente al Traslado de Tienda por Motivo de Cierre de Tienda Plaza Guayama", *op.cit.*

personal gerencial y el resto de sus empleados. Como parte de su prerrogativa gerencial, El Telar diseñó un plan de antigüedad para cada una de las clasificaciones ocupacionales, gerenciales y no gerenciales. Bajo la lógica del mismo, era razonable pensar que los empleados de mayor antigüedad debían ser retenidos sobre los que tuvieran menos antigüedad.

Del plan de antigüedad se puede observar que la tienda de Patillas fue cerrada el 21 de agosto de 2006. Mientras, la de Plaza Guayama fue cerrada dos días más tarde, el 23 de agosto de 2006. En la tienda de Guayama, laboraba la señora Figueroa Rivera, quién tenía 18 años de antigüedad, mientras en la tienda de Patillas trabajaba la señora Lugo que tenía apenas 6 meses de trabajo y antigüedad acumulados. **La implantación del estudio de antigüedad, tuvo el efecto práctico de trasladar a la empleada con más antigüedad al pueblo Mayagüez, mientras transfirió a la de menos antigüedad al pueblo de Juana Díaz, ciudad que está apenas a media hora de Guayama.** Esto provocó la renuncia de la señora Figueroa Rivera, una consecuencia que el patrono podía razonablemente prever. **Todo esto se suscitó, a pesar de que al momento del cierre de Plaza Guayama, tanto el puesto de gerente de la tienda de Juana Díaz como la de Mayagüez, estaban ocupados por personas que llevaban sólo seis meses trabajando para la compañía.** Ambas gerentes, la señora Lugo de Juana Díaz y la Sra. Ariselis Sánchez Vadi de Mayagüez,

comenzaron a laborar en El Telar en la misma fecha, el 13 de febrero de 2006.[63]

**La actuación originalmente legítima de El Telar, de cerrar por motivos económicos varias de sus tiendas, se convirtió en una injustificada e irrazonable cuando al aplicar su plan de antigüedad incumplió y no respetó la intención de la Ley 80 de proteger la tenencia del empleo de aquellos empleados que tuvieran mayor antigüedad. Es decir, a la señora Figueroa Rivera no se le protegió el derecho de retención que le concede la Ley 80 por tener 18 años de servicio laborando para El Telar. Esto a pesar de que el estatuto le impone al patrono la obligación de retener a los empleados de mayor antigüedad siempre que hayan puestos vacantes u ocupados por trabajadores de menor antigüedad en la misma clasificación ocupacional.** Esto no implica que los empleados tengan un derecho a que se les ubique en el lugar geográfico que deseen. De lo que se trata es de su derecho a ser retenidos en las condiciones explícitas que dispone le Ley 80.

Ante esta situación fáctica, es obligatorio cuestionarnos, ¿tenía El Telar otras alternativas que resultaran menos onerosas que el traslado de la señora Figueroa Rivera a Mayagüez y, a la vez, fueran consistentes

---

[63] Apéndice del recurso de *certiorari* en el Tribunal de Apelaciones, Estudio de Antigüedad, *op.cit.*; Apéndice del recurso de *certiorari* del Tribunal de Apelaciones, Contrato de Trabajo Probatorio de la señora Sánchez Vadi, pág. 63. El contrato de la señora Lugo no formaba parte del expediente del caso.

con el buen funcionamiento de la compañía? De entrada es evidente que sí. **El Telar tenía la opción de cumplir con la Ley 80 de 1976 de dos maneras: (1) trasladando a la señora Figueroa Rivera a la tienda de Juana Díaz y cesanteando a la señora Lugo, quien tenía mucho menos antigüedad, o (2) trasladando a la señora Figueroa Rivera a la tienda de Guayama Pueblo, enviando a la gerente de esa tienda, que según las determinaciones de hechos del foro de instancia tenía 5 años con la compañía, a la de Juana Díaz y cesanteando a la señora Lugo.** De esta manera, se hubiera respetado el derecho de retención de la señora Figueroa Rivera utilizando el criterio primordial de la antigüedad.[64] **Al existir otras alternativas a la opción impuesta por El Telar, y éstas no interferir o afectar el normal funcionamiento del negocio, es obligatorio concluir que la actuación de El Telar de trasladar a Mayagüez a la señora Figueroa Rivera fue injustificada y caprichosa.**

Como se cumplen todos los elementos para configurar un despido constructivo, me parece evidente que la mayoria se equivoca al revocar la sentencia del Tribunal de Apelaciones. En vez, confirmaría la sentencia y le ordenaría a El Telar que indemnizara a la señora Figueroa Rivera en la cantidad de $24,000, equivalente a la mesada computada desde que inicio sus labores con El Telar, el 19 de mayo de 1988,

---

[64] Esto debido a que no hay evidencia en el expediente que valide el uso del criterio de eficiencia o capacidad para sostener que se mantuviera a la empleada de sólo 6 meses de trabajo.

hasta la fecha de su renuncia el 24 de agosto de 2006, más 25% por concepto de honorarios de abogado.


                              Liana Fiol Matta
                              Jueza Asociada